et al. Mr. McHugh for the petitioner, Ms. Blair Kajowski for the respondents. May it please the Court, my name is James McHugh, and I represent Mock Mining, LLC. Mock Mining operates an underground coal mine in Johnston City, Illinois, using continuous mining sections as well as longwall sections. There are two citations that are on appeal here, and the first citation is 667-9603, which Mock is appealing the high negligence designation and the SNS designation. The second citation is 668-3204, and Mock is appealing the high negligence designation. How much of the penalty is related to those enhanced payments? Your Honor, the penalty was based on the application of Part 100. Just let's see. Just let's answer the question. How much was the total penalty? The total penalty was, I believe, $4,000. $4,000. So how much of that was due to the enhancement in your challenge? It would be a fair amount, Your Honor, probably two-thirds, because the high negligence designation bumps the points up, and so does the SNS designation. So this appeal is all about $3,000? No, Your Honor. It's about much more than that. It's about the definition of high negligence and the fact that the judge disregarded the mitigating circumstances in this case. No, but I'm saying the consequence, this is about $3,000, right? Well, Your Honor, that's I mean, is there anything else? Are there any other consequences to the company? I just want to know what's at stake here. Is there any other consequence to the company from having The only other consequence to the company, Your Honor, is the precedent when the judge disregards the mitigating circumstances in the law. Doesn't your answer have to be that the statute provides for progressively increased penalties, so these points add up? Yes, Your Honor, it does. It does provide for increasing penalties in the In future cases? In future cases. So, in other words, in a future case, the ALJ could take account of the fact that the company here had a significant and substantial or high negligence finding in a previous case? Certainly with respect to the SNS and also high negligence if it's a similar citation, Your Honor. I see. So it could be used against the company in a later case? It could, Your Honor. I thought it was now mandatory. I thought on these withdrawal orders that after so many SNS violations, it's a mandatory withdrawal order, which is huge. You're talking about the POV regulations, Your Honor. Right. And yes, once the mine gets on POV, it has to have a clean inspection with no SNS. Okay, you answered my question. Go ahead, Your Honor. Okay, thank you, Your Honor. First of all, with regard to citation 667-9603, it involves a violation of 75-400. Did you just not use the numbers? Are you talking about the accumulation one? Accumulation, yes, Your Honor. Why don't you use English instead of numbers? Yes, Your Honor. The accumulation citation involves a transfer point where one belt was dumping onto another belt and there are accumulations at those locations. And what happened in this case is on the 29th of October, one mock examiner found accumulation at that location and noted it in the book as he's required to do. Then later in the day, at about 9 p.m., another mock examiner was in the area, and at 9.30, he was walking past that area and he noted it was clear. He was on his way to a transformer to examine a transformer. That was Dave Adams. Dave Adams said that area was clear at 9.30. The ALJ didn't credit his testimony. He said he wasn't there for that purpose and he really wasn't looking at it, and so he didn't credit that statement about observation. You're right, Your Honor. He gave it no weight. He didn't say that Mr. Adams was incredulous. No, but that's not why he was there. He was passing through and had this other testimony. Was it Inspector Law? Yes, Your Honor. With 27 years of experience and given the amount of accumulation and all. Yes, Your Honor. Well, Inspector Law had his 27 years of experience, but Examiner Adams also had 30 years of experience as a certified examiner, and although he may not have been— Do you know of a case where we have upset a credibility finding like this? Can you cite any case where we've done that? Your Honor, the closest I could come to that was the Jim Walter case. And if the court would remember the Jim Walter case, I believe Judge Henderson was on that. The judge had found that Mr. Maddox was incredulous. The way the court dealt with that, they didn't actually get to the credibility finding. What they did was they transferred it to a substantial evidence conclusion. They basically considered the judge's determination on Mr. Maddox, and they said, well, we don't have to go there because the substantial evidence does not support the conclusion of the administrative law judge, and the administrative law judge did not consider these other factors. So— So that's not a very strong case for you. Your Honor— Judge Tatel's question was, have we ever overturned a credibility determination in this type of context? I'm not familiar with the case, but this is not technically a credibility issue because the judge did not find Mr. Adams to be incredulous. Well, my mistake then. He gave no weight to Mr. Adams' statement of observation. Yes, Your Honor, for reasons that are not supported by the substantial evidence. Well, ALJ did give some reasons. He did. He said that Mr. Adams was not in the area specifically for the belt tail. He had to walk past it. But the same could be said for Inspector Law. He was not in the area to inspect the— But how can we—you've got a firefighter who had two witnesses. One said A, the other said B. And he said the first one was not—A, it was not murderous, and B, had more experience. I just don't see any basis for an appellate court to upset that. Well, Your Honor, let me handle that two ways. The first would be it's not even necessary to get to that issue, as in the Jim Walter case, because the court can decide this case based on the fact that there were mitigating circumstances and the judge did not credit those. The law is very clear that if there are mitigating circumstances, that there can be no high negligence. The turning off of the belt? The turning off of the belt. But again, the ALJ, based on law's testimony, concluded that that was not a mitigating circumstance because it could have been turned back on. Your Honor, that gets into the whole issue of continued normal mining operations, which Mott contends that the Secretary and the judge have misinterpreted. Continued normal mining operations, in the cases that are cited on that, if the court reads the cases, you'll see that all of the elements of the confluence of factors came together in all of the cases where continued normal mining operations came up. At the time of the citation, the elements were in place for continued hazard. For example, the Secretary cites Cypress Cumberland. Well, all of the elements of the fire triangle were present there because the belt was still in operation. U.S. Steel, all of the elements of the factors to support the hazard were still in place because the defective cable was still in use. So this case is different than that because inspector law had turned it off. If you go down the road of saying, well, it could be turned on at any time, then virtually any citation could be deemed S and S because the court could just take that leap of logic and say that under continued normal mining operations it doesn't matter if the belt's turned off or the condition is locked out because it can always, someone can go back and fix it. But he says specifically that the evidence suggests that the belt was reasonably likely to be re-energized in the course of normal mining operation. Right? Yes, Your Honor. Once he said that normal mining operations, the point you're making is exactly why there was a risk that this belt would be restarted. Well, in this case, Your Honor, the belt was turned off and there were several intervening factors that prevented the area from being cleaned, including a roof fall in by this area as well as an accident where a miner was injured. And in addition, the MSHA issued a 103K order which prevented the, so it places the operator in a very difficult position. The operator does what it's supposed to do, finds the problem, corrects, starts correcting it, takes steps as the standard says, and then it's placed in a position where it doesn't have time to fix it. And then it's cited and then the secretary says, well, that's continued normal mining operation. But now at 2.30 they saw the accumulation. Yes, Your Honor. And either Webb or Adams said in his testimony all it took was a shovel. And so at least for an hour until the roof collapsed and the 103K order was hours after that, they had at least an hour to take a shovel and remove that accumulation. Even if it wasn't there at 9, it was certainly there at 2.30. I think it took two hours to abate, Your Honor, if you look at the citation. And the roof fall happened approximately a half an hour to an hour sometime in there. But it was 2.30 when Mr. Adams saw the accumulations and then between 3 and 3.30 when the roof fall occurred. So there wasn't a great deal of time to react. When the roof collapses, does everybody, I mean, that 103K order wasn't in effect yet. Couldn't the fellow with the shovel take the time to clear that accumulation? Well, Your Honor, it was a very significant roof fall. It crushed out the temporary belt. The operator has to start getting its available workforce to place cribbing and to keep the fall from spreading. So since they know there's no production going on, then they do have to at some level, as one of the witnesses said, stage the work, take care of what's critical and then come back to it. But they never had a chance to get back to it. Why was there such a gap? Because a roof collapse sounds to me like it's pretty serious. And then there's no inspector till 7.30 and no order till then, at least then. I can't answer that, Your Honor. I did want to briefly mention the other citation because these go hand in hand as far as the law on mitigation, where they had this charging station in the primary escapeway, and they had been cited for it previously. And the MSHA allowed them to keep the charging station in that primary escapeway and lock it out to terminate the citation, and that's a term of art. And that happened on October 28th. And then on November 17th, the charging station was still in that location. It had had some work done on fire suppression, but it was still in that location. And Dave Adams discovered that, the general manager, and he took direct action, as the standard says on mitigation, to he took steps to correct that problem by locking out that charging station. It's not fair to mock. But didn't the ALJ find it wasn't locked out? It wasn't locked out when Mr. Webb came on it, Your Honor. He immediately locked it out. But that was 10 days after the November 7th abatement. It was, Your Honor. To place it in context, Mock was looking at ways to use the charger in that area, working with MSHA.  And they fixed it by doing some airway construction to move a power center over to the belt entry. The same could have been done in this case, and they were looking at options to place airlock doors on either side of the charging station. How big is this charging station? Just approximately, is it the size of that podium, or is it much smaller? It was described as being about the size of a conference table or a desk, Your Honor, I believe is the testimony. I'd have to look back at it. So it's a major obstruction in the primary escapeway. No, Your Honor, it's back in a crosscut. So the primary escapeway is unobstructed. It's moved back in a crosscut. I thought the citation included where it was located, namely in the primary escapeway. Only to the extent that it's not isolated from the primary escapeway by ventilation controls. What? I don't understand what you mean. A stopping or an airlock door. In other words, you've got the primary escapeway with crosscuts on either side, and as you go forward, each crosscut would have an area. Is a crosscut sort of like a right turn or a left turn off of the primary, like if it's a corridor? Yes, Your Honor. A crosscut goes off to the side? Yes, Your Honor. And that's for safety? Is that what that's for? It's just how they build the, they develop the entries. So following up on Judge Rodgers' question, where was this conference table type device, size device? Was it, I thought like she did, that it was in the primary? No, Your Honor. No? It's back in one of the crosscuts in the primary. And it also has some virus suppression. But you're not arguing that doesn't mean the regulation doesn't apply, right? It still applies, doesn't it? You can't have these in those crosscuts, right? You cannot have them in the primary escapeway and in the crosscuts associated with the primary escapeway. Right. So this is all irrelevant to your argument. That's right. Right. As far as it being in it? Yeah. You're not arguing it wasn't there. No, Your Honor. We didn't contest the actual citation. What we contested was high negligence in that MSHA told us we could have it there as long as it was locked out. And then, because we were looking at options for using it. And then later when Anthony Webb discovered it on his own and took actions, as the law says, to correct the problem by locking it out, he didn't have a chance to get it out of there before Mr. Cripps came and cited it. But he took action, and that's the key point here. Because the law is very clear on mitigation. But he had all, not he, but Mock had already been cited. Yes, Your Honor. All right. So it's not as though there wasn't time to get this out of the escapeway. Well, MSHA allowed it to stay there. They terminated the previous citation by saying, you can leave it there, Mock, as long as you lock it out. Now, Mock didn't put in evidence of this previous citation. Is that correct? That's correct, Your Honor. But the parties didn't disagree. I mean, the Secretary. Well, I think there was disagreement. Because Mr. Cripps, Inspector Cripps, said he wouldn't have terminated it, the original. So, I mean, it's not clear to me exactly what happened and why Mock thought it could leave the charging station in the crossway in the primary escapeway. Well, Your Honor, Mr. Cripps didn't terminate the previous citation. The inspectors don't always terminate their own citations. I understand. But all I'm getting at is we don't know what, as far as the record is concerned, we don't know what happened with that primary escapeway. We know what your client's witnesses stated. And we know what MSHA agreed, that the previous citation was terminated by being locked out. Everyone agreed on that. It wasn't contested at the trial. But we don't know that it was not locked out for as long as 10 days. We know that at some point during those 10 days, Your Honor, Mock had additional fire suppression equipment installed on that. And, by the way, I should note that there's fire suppression equipment on the roof above this, too, so it's not just the one unit. And at that point, it was taken out of the mine. And a contractor, fire safety, Lowell Holler, they performed these repairs to it or these supplemental fire suppression. I thought that was before November 7th. It was, Your Honor, sometime in that 10-day period between October 28th and November 17th. Well, no, I'm talking about November 7th, which was when it was terminated, right? Or was it terminated on October 28th?  And then 10 days later, the general manager sees the padlock or whatever is gone. And we don't know. It could have been that way for 10 days. That's what I was asking. Well, of course, there was no evidence of the record on this, but because it was removed at some point in time, the only reason the termination took from October 28th to November 7th is there were three specific pieces of equipment involved in the earlier citation, a power center, a charging station at another entry, and this charging station. The charging station at the other entry was removed from the mine. The power center was moved, was isolated from the primary escapeway by a wall or a stopping, and that solved that. And this particular charging station was allowed to stay there by MSHA as long as it was locked down. And sometime after that, it was – This wasn't the one that was hauled up to the surface? Yes. This wasn't the one? Okay. So it did leave the escapeway to be fixed up. It did leave. And unbeknownst to MOC, somebody put it back at that specific location, MOC's management. The contractor had worked on it at MOC's facility, and it got back to the location. And after that, Anthony Webb was driving past it. He saw it there, and he stopped to look at it, and he said it's not locked out. It's got to be locked out, as the prior citation said, or termination. Your argument is that this was a legitimate mitigating factor because Webb, when he locked out the machine, had been told by the inspector that that is what the law required, right? That's one part of our mitigation argument, Your Honor. That is one part. Okay. What do you do with the fact that the ALJ said, you know, that could be a legitimate mitigating factor, even if it was wrong? That is, even if what the inspector had said was wrong. But he said, in this case, it doesn't work because Webb knew that it would not satisfy the requirements of the regulation. And you rely on the sentence, on the statement by Webb that says, we were doing the next best thing until we could get the charger out of it. Your Honor, if you look at the actual transcript on that. That's what I was just reading to you. I know, but if you page back a little bit before that, Anthony Webb said he thought that that met the requirements, but then when he was questioned, over time he said, well, we did the next best thing. And the ALJ looked at the whole transcript and concluded that that suggests to him that Webb knew this was wrong. So now we're back to credibility determination, aren't we? Well, the judge never cast it in terms of a credibility issue, Your Honor. Do we require that? In order for us to defer to a credibility determination, does the ALJ have to say, this is based on my assessment of a witness? It's so obviously based on his assessment of the credibility, isn't it? He says, he's interpreting, it's probably not even credibility. He's interpreting that Webb is saying, you know, I knew that this wouldn't do the job. Next best thing. Your Honor, our argument on mitigation, first of all, the law on mitigation is clear. If there's mitigation, there can be no high negligence. But the ALJ said there wasn't mitigation because he knew that locking it out wouldn't satisfy the regulation. And that's a violation of the clear definition of mitigation, which includes, it's including but not limited to actions taken to prevent or correct. So the judge violated the law on that respect because Anthony Webb clearly took an action to correct the condition that he found it in when he locked it out. I thought the commission had held that you could still find high negligence even if there was mitigation. It didn't absolutely preclude that determination. Your Honor, I think you may be referring to the Hidden Splendor case where they say that the commission's definition of negligence is more nuanced than the inspector's definition of negligence. But the issue here is that the law says that mitigation is actions taken to prevent or correct a hazardous condition, and that's exactly what Anthony Webb did. Well, I'll find the case. The name doesn't come to my mind right now, but I thought the commission had clearly stated that. And the commission does have this different view of negligence. But insofar as the ALJ's findings are concerned, they were consistent with what the commission has said. Well, they're not consistent with Part 100, Your Honor, 100.3D. And that is that where the operator takes action to prevent or correct the problem. And that's exactly what – I mean, the whole standard – they're not consistent with the standard of care for that matter. The Secretary cites the standard of care as it's a high standard of care that requires the operator to be alert for conditions and hazards in the mine which affect the safety and health of employees by taking steps necessary to correct or prevent such conditions or practices. So the standard of care – MOC complied with the standard of care, but it's a strict liability, and there's levels of negligence. So MOC met the designated standard of care. So could I just understand, what is MOC's position as to where this charging station is allowed to be now? Your Honor, it's allowed to – it's not allowed to be in the primary escapeway or in the cross cuts unless it's isolated by either an airlock door or a stopping, which would basically place it in the next entry over. All right. Fine. And it's also – it can be used to maintain the escapeway, something. I don't know what that means, but that was not in this case. That is true, Your Honor. It can, but MOC did not make that argument here. It wasn't using it for that purpose. Okay. We'll give you a couple times in response. Okay. Thank you, Your Honor. Ms. Blair-Kijewski. Good morning. Good morning. Good morning, Your Honors. I'd just like to clarify something that the opposing counsel said about the size of this equipment that was in there. First of all, Your Honor – What's the size of the – The size of the charger. Oh. Okay. Your Honor, the transcript says it was 6 feet long, it was 3 feet wide, and it was 3 feet high. This was a pretty sizable piece of equipment in that there were – it was an 800 – excuse me, 480 – None of this is relevant to the issue of the question. Your Honor, I just wanted to clarify how big it was. Yes. I asked the question. I'm sorry. Yes. Thank you. I just wanted to clarify that it was indeed a very large piece of equipment that had wires suspended from the ceiling, electric wires. And, Your Honors, I could not imagine that this piece of equipment was taken from the mine when it was first sighted. And there's this hole, unfortunately, in our evidence in that no one is sure what happened between when that first citation was issued on October 28 by Inspector Cripp and when it was seen later on. When the second inspector terminated that first citation, the first citation, we don't know why that inspector gave this mine permission to lock it out. The language of this is clear. It says, no charging stations in the escapeway. And both the trial counsel, regrettably, and as well as the inspector who had written, who had terminated the citation, neither of them is with the Department of Labor and couldn't be reached. So that's the hole. I'm confused now. Is it the department's position that because the regulation is clear, it makes no difference at all what the mine operator was told? No, Your Honor. But there must have been some extenuating circumstances. Suppose the mine operator were told, yes, the regulation says it can't be there, but locking it out satisfies the regulation. Well, that's clearly what the mine operator was told on that occasion. But, Your Honor, the very next day, the very next day after the citation was issued, this piece of equipment was on the surface getting worked on. The fire suppression system, that was the company that upgraded it from a four-bottle piece of equipment to a six-bottle piece of equipment, which meant it was larger. It had more fire suppression parts to it. The very next day, they were at the mine upgrading the piece of equipment. So, for argument's sake, we may say that that's probably what happened. That's why this mine, on that particular day, under these particular circumstances, was given the go-ahead to put the lock on it. They may have, for argument's sake, said, you know, this piece of equipment is on its way out right now. And this inspector may have said, well, let's lock it out until it's above ground, because we're not sure. Because the regulations are clear, and they say this piece of equipment ought not to be in this escapeway. And, Your Honor, this company got one bite of the apple in that they were able to sort of, quote, unquote, get away with this, but doing the next best thing. And that's not appropriate. The language is clear. It says that it ought not to be there. And this is an obstruction issue with miners trying to leave a mine in an emergency situation, perhaps claustrophobic, perhaps anxious in an emergency. And this huge piece of equipment is there. They knew about it. And between one and two days before the second citation was issued, the most senior person at this operation saw this equipment there and had plenty of time to move it. And he chose not to do so. He chose to do the next best thing. That's not good enough in a mine. And regarding the accumulations, citations, Your Honor, we allege that both the SNS as well as the negligence findings, the high negligence findings, are appropriate in this situation. According to the Mack Company witnesses, whatever is happening, whenever there is a hazard in the mine, it's entered into their examination book. And when the work is done correctively, it's entered in the examination book. And there are two consecutive shifts. The afternoon shift on October 28th. And the shifts are broken down from 7 to 3, 3 to 11, 11 to 7 in a 24-hour period. So for that afternoon shift, the examiner noted in their examination book that the permanent belt needed to be cleaned. And this was noted again in the next shift, the midnight shift, that this area needed to be cleaned. And so the ALJ and Judge Pius appropriately determined that there was no intention of cleaning this because, and credited the inspector rather than Mr. Adams, because Mr. Adams arrived at the mine at 9 o'clock at night. At 9.30, he went in the area, the sited area, and as was pointed out before, he admitted that he was not concentrating on the accumulations. He realized that the mine, the operation, production was going on, but didn't pay close attention to it because he was more concerned with this belt transformer that was problematic. So he sort of bypassed accumulations and went to fix the belt. When he returned at 2.30 in the morning, he saw that the whole area was gobbed up, and that's when he shut the belt down. The opposing counsel also mentioned that, for purposes of mitigation, that the other belt was already shut down. Of course, the other belt was already shut down, but not because of the accumulation. They were in the process of moving that belt. Think of, if you will, the permanent belt being the top of a T, and the bottom of the T is the temporary belt, the pony belt, and the pony belts feed onto the permanent belt as they move along. And the belt, the temporary belt that was stopped, wasn't because of anything except they were moving it to a different location. So that's not mitigation as far as we could tell. There's no mitigation here in either case, and the Secretary submits that the Commission's and the ALJ's findings should be upheld. If you have no more questions, I... You know, I just have one quick question for you. Hold on. You say, I was curious, in your brief, you say that we reviewed, that our review is de novo here. That's not my understanding of our... I'm sorry, I don't understand the question. I'm wondering if you're... No, your brief says, your brief says, I'm sorry to write down the page number, but it says, it says, it says our review of whether, of the administrative law and the Commission's decision is de novo. Is that right? Yes, sir, and I think that the Court has de novo reviewed. Really? Yes. Well, no. We've held that our review is for substantial evidence. The case you cite for this, by the way, is a Commission decision. Which, you know, maybe the Commission reviews it de novo, but I would have thought the Department would understand our standard of review here. So, it's based on substantial evidence? Well, I'm looking at pages 17 through 18 of your brief. Did you state the standard of review at some other point in your brief? Where do you cite American Coal? American Coal. Page 20. Page 20. It doesn't make any sense. You agree that our review is not de novo here, right? It's a standard review. Our review is for substantial evidence. All right. I just wanted to be sure you agreed with that. That's all I need. Your Honor, if I may, could you, you're 17 or 18? Well... And title standard of review? That's all right. We'll clear this up later. Thank you. You agree with me about the proper standard of review? Yeah, that's what your brief says. Thank you. Okay. Okay, why don't you take a minute, Mr. McHugh. Thank you, Your Honor. Very briefly, I did want to mention that the reason we're challenging the S&S on the belt is because the confluence of factors was interrupted when the belt was turned off. And the commission has long held the confluence of factors test on cases involving ignition. On cases involving what? Sorry, Your Honor. Possible ignition. Ignition. Thank you. As far as whether or not Mr. Adams was concerned with the belt tail, as counsel said, he was clearly concerned. He's an experienced examiner. He's concerned with any hazard. That's his certified, his duty is to look for hazards. And he said that he was not making the belt exam at the time. He went into the area because we had a belt transformer I had to make. But I observed the belt tail. Clearly he says that. The belt was running, the pony belt was dumping on it, and the area was wet. The tail rotor was clear, and that's all I've seen. So he was in the area. He's a trained examiner. And the ALJ was focusing on the fact that Adams was talking about the area being wet. Yes, Your Honor. That's it. I don't think, I mean, it's clear from his testimony that he was talking about more than that. He says the tail rotor was clear. Right. I think it might have been a mistranscription. It may have been tail motor. But as far as leaping back from the time Adams turned it off at 2.30 in the morning back to the prior afternoon, the judge made an inference there, and the inference is not appropriate. In order for an inference to be appropriate, it has to be rationally related to the facts it's derived from. In the Garden Creek case, recognition of an inference is largely influenced by obtaining direct evidence necessary to establish the fact to be inferred. In that case, the record did not establish that the secretary was unable to obtain the evidence to support the inference. The secretary cited two cases involving a reverse FOIA on inference and said, well, the judge could take an inference because one party doesn't have access to the evidence. But those cases don't apply in MSHA because an inspector has unfettered access to these minors to interview them. So all this idea about the secretary not being able to have access to evidence doesn't apply in this case because this inspector does. I also wanted to note in further response to why Mock allowed that charger to stay there after the 28th citation, Anthony Webb says it quite clearly. Question, did you believe the charger could be in the primary escape way if it was locked out? Answer, I thought at the time, yes, because we were trying to figure out a way to utilize that charger, to do it in a way to satisfy the law, because as Mr. Cripps said earlier, if the charger was necessary, we had to figure out a way we could do it and still comply with the regulations. So contextually, Mock was trying to consider a way to keep that charger there by building airlocks on either side to isolate it from the primary escape way so that then they could bring the scoops in and charge them without exposing the primary escape way to the charger. So it's not like they just left it in there to disregard the law and to commit negligence. That's another mitigating factor, actually. So the judge disregarded that mitigating factor, didn't even discuss it, failed to discuss it. It's inconsistent with the substantial evidence. You need to wind up your argument. You're over your time. Thank you, Your Honor. I'm sorry. So for the reasons we've stated, because there was mitigation and because the confluence of factors was interrupted, Mock requests that the court reverse the judge on his finding of high negligence with respect to the two citations and the S&S. Thank you. Thank you.
judges: Henderson, Rogers, Tatel